IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| POWER SOAK SYSTEMS, INC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EMCO HOLDINGS, INC., )<br>)<br>Defendant/Third Party )<br>Plaintiff, )<br>)<br>v. )<br>)<br>JOHN CANTRELL, )<br>)<br>Third Party Defendant. ) | Case No. 06-0314-CV-W-NKL |

ORDER

In 2003, Defendant/Third Party Plaintiff EMCO Holdings, Inc., ("EMCO") sold all

shares in a company called Metcraft to Plaintiff Power Soak Systems, Inc., ("Power

Soak") through a Stock Purchase Agreement ("SPA"). At the time, Third Party

Defendant John Cantrell was the owner and president of Power Soak as well as the vice

president of Metcraft. Two years after the sale, Power Soak withdrew Metcraft from the

Sheet Metal Workers International Association (the "Union") and stopped making

monthly contributions to the Sheet Metal Workers' National Pension Fund (the "Fund").

That withdrawal subjected Power Soak to $1,757,943.86 in withdrawal liability under the

Collective Bargaining Agreement that was in place between Metcraft and the Union when

1

the SPA was executed.  Claiming that Metcraft's obligations to the Fund were not disclosed by EMCO at the time of the Stock Purchase Agreement, Power Soak sued EMCO for fraud and breach of contract.  EMCO then impleaded Cantrell as a third party defendant claiming that he breached his fiduciary duty to Metcraft and committed fraud when he executed a security agreement with EMCO.  Pending before the Court are EMCO's Motion for Summary Judgment [Doc. # 56] and Power Soak's Motion for Partial Summary Judgment on Liability [Doc. # 57].

## I.      Factual Background

EMCO was once the sole shareholder of Metcraft, a company which manufactures and sells patented continuous-motion, commercial pot-and-pan washing systems.  On October 9, 2003, EMCO sold all its shares in Metcraft to Power Soak, a holding company formed by Metcraft Vice-President John Cantrell for the purpose of buying Metcraft from EMCO.  Cantrell, EMCO, Power Soak, and Metcraft were all signatories to the SPA.

At the time of the sale and for many years prior to it, Metcraft was a party to two Collective Bargaining Agreements with the Union – one for production workers and one for journeymen – which required Metcraft to make monthly contributions to the Fund. The Collective Bargaining Agreements discussed Metcraft's obligation to make payments on behalf of its employees to a pension fund, but the name of the Fund is only listed in an addendum to the original Collective Bargaining Agreement and neither the Collective Bargaining Agreement nor the addendum were attached to the SPA.   Although Cantrell was aware that Metcraft employed Union workers under two Collective Bargaining

2

Agreements and made monthly contributions to a pension fund, he has testified that he had no knowledge that the Fund in question was a multi-employer plan within the meaning of ERISA.  Indeed, during the negotiation of the SPA, Cantrell's counsel requested the following representation be included among EMCO's representations and warranties:

> 6.24  **Employee Benefit Plans**.  Except as set forth in Section 6.24.1 of the Disclosure Schedule, . . . [ Metcraft] has not previously made, nor is currently making, nor is it obligated in any way to make, any contributions to, nor has any liability or obligations with respect to, any multiemployer plan within the meaning of Section 3(37) or Section 401(a)(3) of ERISA or any pension plan which is subject to Section 412 of the Code or Title IV of ERISA. . . .

There is no Section 6.24.1 attached to the SPA, though there is a "Section 6.24–Employee Benefit Plans" among the disclosure schedules; however, the disclosures in that section relate only to healthcare and life insurance policies.  There is no mention of any pension, let alone a multi-employer pension, within the meaning of ERISA.

On July 3, 2003, three months before the Agreement was signed, Cantrell signed a letter of intent that expressly gave Power Soak and Cantrell the right to conduct an "audit" of Metcraft's books and records including, but not limited to, "corporate, financial and tax records, and legal and contractual compliance and liability."  Cantrell later admitted to a third-party that Power Soak's pre-purchase due diligence "failed to reveal" that the Collective Bargaining Agreements required participation in a "multi-employer plan."

3

Around the time the SPA was executed, Cantrell–who had been serving as Metcraft's Vice President and General Manager until the sale was completed–signed a security agreement as Metcraft's president in favor or EMCO for part of the purchase price. The security agreement states that its execution was a condition precedent to the closing of the Agreement, and it contains, among others, the following representations and warranties by Metcraft, Power Soak, and Cantrell Industries:

> 2.12. ERISA MATTERS. (a) No Pension Plan has been terminated, or partially terminated, or is insolvent, or in reorganization, nor have any proceedings been instituted to terminate or reorganize any Pension Plan; (b) neither any Grantor nor any Consolidated Subsidiary has withdrawn from any Pension Plan in a complete or partial withdrawal, nor has a condition occurred which, if continued, would result in a complete or partial withdrawal; (c) neither any Grantor nor any Consolidated Subsidiary has incurred any withdrawal liability, including, without limitation, contingent withdrawal liability, to any Pension Plan, pursuant to Title IV of ERISA; (d) neither any Grantor nor any Consolidated Subsidiary has incurred any liability to the Pension Benefit Guaranty Corporation other than for required insurance premiums which have been paid when due; (e) no Reportable Event has occurred; (f) no Pension Plan or other "employee pension benefit plan," as defined in Section 3(2) of ERISA, to which any Grantor or any Consolidated Subsidiary is a party has an "accumulated funding deficiency" (whether or not waived), as defined in Section 302 of ERISA or in Section 412 of the Internal Revenue Code; (g) the present value of all benefits vested under any Pension Plan does not exceed the value of the assets of such Pension Plan allocable to such vested benefits; (h) each Pension Plan and each other "employee benefit plan," as defined in Section 3(3) of ERISA, to which any Grantor or any Consolidated Subsidiary is a party is in material compliance with ERISA, and no such plan or any administrator, trustee, or fiduciary thereof has engaged in a prohibited transaction described in Section 406 of ERISA or in Section 4975 of the Internal Revenue Code; (i) each Pension Plan and each other "employee benefit plan," as defined in Section 3(2) of ERISA, which is intended to qualify under Section 401(a) of the Internal Revenue Code and to which any Grantor or any Consolidated Subsidiary is a party has received a favorable determination by the Internal Revenue Service with respect to qualification under Section 401(a) of the Internal Revenue Code; and (j) neither any

4

Grantor nor any Consolidated Subsidiary has incurred any liability to a trustee appointed pursuant to Section 4042(b) or (c) of ERISA.

The security agreement does not state that Cantrell, Metcraft, Power Soak and/or Cantrell Industries, Inc., were relying on the representations and warranties made by EMCO in the SPA as a basis for the representations and warranties made by them in the security agreement; however, Power Soak and Cantrell contend that they did rely on those warranties as the basis for those they made in the security agreement. The parties dispute whether the SPA or the security agreement was executed first.

Metcraft's historical records, which were kept in Metcraft's corporate offices where Cantrell worked, show monthly contributions by Metcraft to the Fund's bank, Brotherhood Bank and Trust, for all fringe benefits including pension benefits for Union members. At all times prior to the execution of the Agreement, Cantrell had "24/7" access to these records. After the Agreement closed, Metcraft continued to make monthly contributions to the Fund "in accord with" the Collective Bargaining Agreements. Both before and after the closing of the Agreement, Metcraft sent contribution payments to the Fund's bank, together with certain forms. Cantrell's signature appears on the October 16, 2003, contribution check to the Brotherhood Bank, which was issued one week after closing, and Metcraft never missed any monthly contribution payments to the Fund after closing.

On December 31, 2005, over two years after the SPA was executed, Cantrell decided to withdraw Metcraft from the Union and the Fund for economic reasons including, but not limited to, Cantrell's inability to negotiate favorable concessions for

5

Metcraft from the Union. At the same time, Metcraft decided to close its Grandview, Missouri, production facility and move its facility to Pryor, Oklahoma, where it would no longer employ Union labor. Metcraft agreed to extend the Collective Bargaining Agreements from their original expiration date of August 31, 2005 to December 31, 2005, to phase out production in Missouri. Following the withdrawal, the Fund imposed "withdrawal liability" on Metcraft under ERISA. As a result of withdrawing from the Union and moving its production facilities from Grandview, Missouri, to Pryor, Oklahoma, Metcraft expected and has actually begun to realize annual cost savings. Metcraft also received over $1.3 million when it sold its building and land to move production to Pryor, Oklahoma.

On August 15, 2006, Power Soak and Metcraft entered into a payment agreement with the Fund under which payments will be made for the withdrawal liability over a 10-year period.

## II.    Discussion

### A.    Cross Motions for Summary Judgment on Power Soak's Breach of Contract Claim

Power Soak and EMCO have filed cross Motions for Summary Judgment on Power Soak's contract claim. EMCO claims that Power Soak cannot prove any set of facts which will permit Power Soak to recover for a breach of contract. In its pending motion, Power Soak seeks partial summary judgment only as to liability on its claim in Count I that EMCO breached its contract with Power Soak in that it falsely represented to

6

Power Soak that Metcraft did not have any obligation to make contributions to a multi-employer pension plan. (Pl.'s Complaint ¶ 31(b).)

Under Missouri law, a party alleging breach of contract must prove: (1) a valid contract exists; (2) the rights and obligations of each party; (3) a breach; and (4) damages. *Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 664 (Mo. Ct. App. 2006). The first two elements of Power Soak's contract claim are not in dispute. Thus, the question before the Court is whether Power Soak has established as a matter of law that EMCO breached the SPA by making a misrepresentation to Power Soak and that breach caused damage to Power Soak.

### 1. False representation

In Section 6.24 of the SPA, EMCO represented to Power Soak that

> Except as set forth in Section 6.24.1[1] of the Disclosure Schedule, . . . [Metcraft] has not previously made, nor is currently making, nor is obligated in any way to make, any contributions too, nor has any liability or obligations with respect to, any multi-employer plan within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA or any pension plan which is subject to Section 412 of the Code or Title IV of ERISA.

EMCO now admits that at the time of closing, Metcraft had been making and was under a continuing obligation to make contributions to the Fund, a multi-employer pension plan as defined by ERISA, per its Collective Bargaining Agreement with the Union.

---

[1]Although there is no document entitled "Section 6.24.1 of the Disclosure Schedule" attached to the SPA, there is a page denominated as "Section 6.24–Employee Benefit Plans" among the documents appended to the end of the SPA. That page catalogs several healthcare and life insurance benefits which Metcraft provides its employees, but it contains no reference to any pension plans, let alone a multi-employer pension plan within the meaning of ERISA.

7

Nevertheless, EMCO claims that the representation contained in Section 6.24 of the SPA was not false because the SPA revealed the existence of a multi-employer plan elsewhere in the SPA and its attachments, and the SPA provides that disclosure of information "under any Section, Schedule or Exhibit of or to th[e] Agreement shall constitute full disclosure for purposes of any other such Section, Schedule or Exhibit." (Section 6 of SPA.) Specifically, EMCO claims that information about the multi-employer pension fund is found in Metcraft's Collective Bargaining Agreement ("CBA"), an addendum to the CBA and a disclosure schedule identified as Exhibit C.

As for the CBA, EMCO has submitted no evidence that any CBA was attached to the SPA, nor even incorporated into the SPA by reference. The CBAs enter the record in this case as an exhibit to the deposition of John McCreight [Doc. # 59-4], not as an attachment to the SPA itself. While Exhibit C is part of the SPA, it only makes reference to "Accrued Union Benefits." It does not mention the multi-employer status of the plan. Likewise, a Disclosure Schedule denominated as "Section 6.12–Conduct of Business," is attached to the SPA, but references only "Pay increases for bargaining unit employees . . . per the bargaining unit contract with Metcraft." Finally, the addendum to the Collective Bargaining Agreement between Metcraft and the Union names the Fund and contains the contribution rates per employee [Doc. # 59-4 at pp. 61, 65], but nowhere describes the fund as a multi-employer plan within the meaning of ERISA.

Given this record, EMCO's argument that the SPA actually disclosed the existence of a multi-employer pension plan must fail as a matter of law. No reasonable juror could

8

believe that anyone reading the SPA would have known that Metcraft had any obligation to a multi-employer plan within the meaning of ERISA based solely on references to a pension plan, or "Accrued Union Benefits" or "Pay increases for bargaining unit employees . . . per the bargaining unit contract with Metcraft." The Court relies on the plain language of the agreement to reach that decision. In addition, EMCO has offered no evidence that an executive in the same industry with similar knowledge to Cantrell would have known that these references identified a multi-employer pension plan.

As for the fact that the Collective Bargaining Agreement named the Fund and the amount of contributions owed by Metcraft for each employee, EMCO cannot rely on an addendum to a document not attached to the SPA and not produced during the negotiations of the SPA to implicitly contradict an express warranty in the SPA. The preface to Section 6, the Sellers' Representations and Warranties section of the SPA, provides that all of EMCO's representations and warranties are "subject to qualification by specific disclosures set forth in the written statement . . . ." However, Section 6 also requires that any such "Disclosure Schedule shall be arranged in schedules corresponding to the numbered sections of this Article 6, and the disclosures in any section of the Disclosure Schedule shall only qualify the corresponding section of this Article 6." Thus, if EMCO intended to qualify its representation in Section 6.24 about multi-employer plans, it could only have done so in a disclosure schedule referencing Section 6.24. As the Court has already explained, however, "Section 6.24–Employee Benefit Plans" of the

9

disclosure schedule makes no reference to any pension funds, let alone a multi-employer plan.

Given, the plain language of Section 6.24 and the absence of any further disclosure to the contrary elsewhere in the disclosure schedule, EMCO clearly represented the non-existence of any obligation to a multi-employer pension fund. Because EMCO's representation in Section 6.24 was false as a matter of law, it breached its warranty as of the time of closing.

### 2. Damages

EMCO contends that Power Soak cannot show that it was damaged as a result of EMCO's misrepresentation because Power Soak has made a substantial profit since it withdrew from the Union and moved to Oklahoma. However, even if a party fails to prove actual damages, proof of the existence of a contract and its breach will give rise to nominal damages. *Id.* (citing *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. banc 1999). Since Power Soak need only show some injury for purposes of liability, proof of nominal damages is sufficient to satisfy Power Soak's obligation to establish injury as a matter of law.

Furthermore, as discussed in the fraud section of this Order, no reasonable juror could conclude that Power Soak did not incur damage as a result of EMCO's misrepresentation. Although there may be a dispute about the proper measure of damages, as a matter of law, Power Soak was damaged by EMCO's breach of contract.

*Godchaux v. Conveying Techniques, Inc*., 846 F.2d 306, 308 (5th Cir. 1988), does

not support a contrary conclusion.  In that case, a Michigan court held that Godchaux had

not made a misrepresentation when he said that his company "did not have any liabilities

of any nature, whether accrued, absolute, contingent, or otherwise . . . ."  *Id.* at 309.  Like

the instant case, Godchaux's business was governed by a collective bargaining agreement

which obligated the company to contribute to a multi-employer pension fund under

ERISA, a fact which was revealed to the purchaser.  A year after the sale, the buyer,

Conveying Techniques, decided to move its operations to Texas and withdrew from the

Union, paying $225,753 in withdrawal liability.

The Fifth Circuit noted that ERISA does not impose withdrawal liability on a

company until it withdraws because "the unfunded vested liability of a pension plan can

change significantly from year to year or even disappear" and depends on many factors

including the fund's investments.  *Id.* at 311.  Any liability "came into existence,

therefore, only because [the buyer] made a unilateral business decision regarding the

management of the business and assets which it had purchased from Godchaux.  By using

or misusing those assets, [it] could have incurred numerous other liabilities (e.g., tort

liability, civil rights or affirmative action exposure, environmental damage, or consumer

fraud), none of which would have been legally attributable to Godchaux."  *Id.* at 311 n.

12.  Rather, Conveying Technique's "withdrawal liability stems solely from [its] business

decision to unburden itself of an unfavorable union contract, and Godchaux is not

responsible for the fact of, or the timing of, that liability."  *Id.* at 306.  Since there was no

11

liability at the time of the sale, Godchaux did not breach his warranty that his company

was not subject to any undisclosed liabilities.

Other courts have reached different conclusions in cases involving withdrawal

liability under ERISA.  In *Triple E Produce Corp. v. Mastronardi Produce*, 530 N.W.2d

772, 774 (Mich. Ct. App. 1995), Triple E acquired a produce company owned by

Defendant Mastronardi in satisfaction for Mastronardi's debts to Triple E.  The produce

company was subject to a collective bargaining agreement with the Teamsters and had

obligations under that agreement to a multi-employer pension fund governed by ERISA.

Evidently, both parties were unaware of the potential for withdrawal liability at the time

of the sale.  Eventually, Triple E decided to pull out of the Teamsters union and incurred

$127,059 in withdrawal liability.  Following a bench trial, the trial court found that

> the unfunded, vested liability (which eventually resulted in the imposition
> of withdrawal liability) existed well prior to Triple's acquisition of Becker
> and resulted from Becker's operations prior to the acquisition. This
> unfunded, vested liability -- while neither mature nor liquidated at the time
> of the acquisition -- became due upon demand by the Fund. The claim of
> the Fund, therefore, fits squarely within the indemnity provision as a
> 'liability, loss, cost, damage . . . of whatsoever kind or nature incurred . . .
> by reason of any . . . claim of whatsoever kind or nature' whether 'accrued,
> matured, unmatured, absolute, contingent or otherwise.' It was out there,
> ready to pounce on an unwitting buyer. . . .

*Id.* at 776.  The Michigan Court of Appeals affirmed this decision.

*Godchaux* is distinguishable because EMCO's warranty to Power Soak

specifically represented that Metcraft was not involved in a multi-employer plan, while

the warranty in *Godchaux* represented only that Godchaux's company has no undisclosed

liabilities at the time of sale.  The buyer in *Godchaux* got what it paid for, a company

12

without current liabilities.  Power Soak did not get what it bargained for, a company without a multi-employer pension fund.  In fact, the SPA had a separate warranty regarding undisclosed liabilities:  Section 6.11 provides that Metcraft "does not, to the knowledge of the seller, have any liabilities or obligations, whether accrued, absolute, contingent, or otherwise . . . ."  If the parties in the instant case were only concerned about undisclosed liabilities already existing at the time of contracting, as was the case in *Godchaux*, there would have been no need for Power Soak to request an additional representation as to multi-employer funds.  Power soak did request that further representation, however, which suggests that the parties were concerned not only with existing liabilities but also with any obligations that might arise from Metcraft's involvement with a multi-employer plan.  At the moment of closing, Power Soak was injured because it did not get what it bargained for, a company unencumbered by a multi-employer pension plan.

### 3.    Reliance

While Power Soak has established the elements of its breach of warranty claim as a matter of law, EMCO seems to argue that summary judgment should not be granted because EMCO in its answer has plead lack of reliance as an affirmative defense.  It is clear, however, that lack of reliance will not defeat Power Soak's warranty claim.  The modern trend is that a buyer need not rely on a seller's express warranty in order to recover for the seller's subsequent breach of the express warranty.  *See* Johannes, Robert J. and Thomas A. Simonis, *Buyer's Pre-Closing Knowledge of Seller's Breach of*

13

*Warranty*, 75-JUL Wis. Law. 18 (2002). The key question is not "whether the buyer

believed in the truth of the warranted information . . . but whether it believed it was

purchasing the seller's promise as to its truth." *CBS Inc. v. Ziff-Davis Publishing Co.*, 75

N.Y.2d 496, 503 (N.Y. 1990) (alterations and citation omitted). In other words, the buyer

is only "relying" on the express warranty being part of the contract. *Id.* at 503-04 ("Once

the express warranty is shown to have been relied on as part of the contract, the right to

be indemnified in damages for its breach does not depend on proof that the buyer

thereafter believed that the assurances of fact made in the warranty would be fulfilled.").

*Also see Interco Inc. v. Randustrial Corp*, 533 S.W.2d 257 (Mo. Ct. App. 1976).

Because Power Soak seeks only a determination of liability at this time, and

acknowledges that the amount of its damages are a disputed issue of fact, its Motion for

Partial Summary Judgment is granted as to its breach of warranty claim, and EMCO's

cross Motion for Summary Judgment on Power Soak's breach of contract claim is

denied.[2]

> **B.     EMCO's Motion for Summary Judgment on Power Soak's Fraud
> Claim**

Under Missouri law, a plaintiff alleging fraud must show substantial evidence of

(1) a representation, (2) its falsity, (3) its materiality, (4) that the speaker knew of the

falsity or was ignorant of its truth, (5) that the speaker intended the representation be

---

[2]In its Motion for Summary Judgment on Power Soak's contract claim, EMCO did not separately address Power Soak's indemnification and warranty claims. Therefore, the Court will not address whether EMCO is entitled to summary judgment on Power Soak's indemnification claim. However, the Court notes the substantial overlap between Power Soak's fraud claim and its claim for indemnification.

acted on in the manner reasonably contemplated, (6) the hearer's ignorance of falsity, (7) the hearer's reliance on the representation as being true, (8) the hearer's right to rely on the truth of the representation, and (9) the hearer was consequently and proximately damaged." *Dorsch v. Family Med., Inc*., 159 S.W.3d 424, 430-31 (Mo. Ct. App. 2005).

EMCO moves for summary judgment on the grounds that Power Soak cannot prove (a) that EMCO intentionally made a false representation, (b) that Power Soak justifiably relied on any misrepresentation, or (c) that Power Soak was damaged as a result of the misrepresentation.

As the Court has already found, EMCO falsely represented to Power Soak that Metcraft had no obligation to a multi-employer pension plan. Nonetheless, EMCO argues that Cantrell cannot prevail on his fraud claim because he said in a deposition that he had no evidence that EMCO intentionally misrepresented information in the SPA or intended to defraud Cantrell. This argument fails because what Cantrell knew several months before the close of discovery does not limit the evidence he can introduce to support a dispositive motion after discovery closes. More importantly, to prove fraud, Power Soak does not need to prove that EMCO intentionally mislead Power Soak. It need only show that EMCO either knew its misrepresentation was false or did not know whether it was true or false. *See* MAI 23.05. There is a disputed issue of fact as to the latter issue which is material.

EMCO also maintains that even if it's representation was false, Cantrell could not have relied on it because he made similar representations earlier in the security agreement

15

which he gave EMCO.  However, whether the security agreement preceded the SPA is in dispute and whether Cantrell relied on it is in dispute.  Cantrell has testified that he didn't know the representation was false, and the SPA itself states that the parties are relying on the representations contained within the Agreement.  There is also evidence that even experienced lawyers would not have known, based on the information available to Cantrell, that Metcraft had a multi-employer pension plan subject to ERISA.  Summary Judgment cannot be granted when these material facts are in dispute.

Finally, EMCO argues that Power Soak cannot prove that it was damaged as a result of the alleged fraud.  The Court is unpersuaded.  EMCO represented to Power Soak that Metcraft was free of obligations to any multi-employer plan.  Since Metcraft was in fact obligated to make payments to a multi-employer plan, the only way to restore the company to its status as warranted would be for Power Soak to withdraw from the Union and the Fund, which would trigger withdrawal liability.[3]

Alternatively, a reasonable juror could conclude that Power Soak would not have bought Metcraft or would have paid less for Metcraft if it knew about Metcraft's ERISA obligations, including its inability to move from Missouri without paying withdrawal liability.  Cantrell testified in deposition that had he known about the potential for withdrawal liability at the time of closing, the purchase price "would have either been lowered or I wouldn't have bought the company."

_____

[3]What is unclear is whether the measure of damages is the withdrawal obligation at the time Power Soak moved from Missouri or the withdrawal obligation that existed at the time the SPA was executed.

16

Finally, the fact that Power Soak made money after leaving the state does not defeat Power Soak's fraud claim because Power Soak could have done the same thing if Metcraft had been as warranted, except without having to pay withdrawal liability. Thus, there is ample evidence in this case to support a finding that Power Soak was damaged as a result of EMCO's alleged fraud.

Because there remain disputed issues of fact, EMCO's Motion for Summary Judgment on Power Soak's fraud claim is denied.

### C. EMCO's Motion for Summary Judgment on its Third Party Fraud Claim Against Cantrell

Given Metcraft's obligations to a multi-employer plan under ERISA at the time the SPA was executed, Cantrell's representation in the security agreement that he gave EMCO regarding the lack of obligation to a multi-employer plan was also false. However, judgment as a matter of law on EMCO's fraud claim against Cantrell cannot be granted because Cantrell's and EMCO's knowledge about the truth or falsity of Cantrell's misrepresentation are disputed issues of fact. There is also a dispute about whether EMCO was damaged as a result of Cantrell's misrepresentation. Summary judgment must, therefore, be denied as to EMCO's fraud claim.

### D. EMCO's Breach of Fiduciary Duty Claim

A claim for breach of a fiduciary duty requires proof of (1) a fiduciary duty between the plaintiff and the defendant, (2) breach of that duty by the defendant, and (3) damages. *Zakibe v. Zakibe*, 28 S.W.3d 373, 381 (Mo. Ct. App. 2000). Because there are

17

disputed issues of fact about whether Cantrell owed EMCO a fiduciary duty and whether

that duty was breached, summary judgment must be denied on this claim as well.

## III.    Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff Power Soak's Motion for Partial Summary Judgment

[Doc. # 57] is GRANTED.  As a matter of law, EMCO is liable to Power Soak on its

breach of warranty claim in Count I.  It is further

ORDERED that Defendant/Third Party Plaintiff EMCO's Motion for Summary

Judgment [Doc. # 56] is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge


Dated:  March 20, 2007
Jefferson City, Missouri

18